IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSEPH LEE MCDONALD,         )
                                      )
      Plaintiff,          )
                                      )  No. 10 CV 4910
      v.                   )
                                      )  Magistrate Judge Michael T. Mason
MICHAEL J. ASTRUE, Commissioner  )
of Social Security,                  )
                                      )
      Defendant.       )

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Claimant Joseph L. McDonald ("McDonald" or "claimant") brings this motion for summary judgment seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied McDonald's claim for a period of disability and disability insurance benefits under Sections 216(i) and 223(d) of the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, claimant's motion for summary judgment is granted in part and denied in part.

## I.    BACKGROUND

### A.    Procedural History

Claimant alleges that he has been disabled since mid-April 2005 due to disorders of the back. (R. 47, 50.) The parties and the ALJ do not dispute that McDonald filed an application for a period of disability and disability insurance on August 28, 2006. (*E.g.*,

R. 12, 50.)[1]  That application was initially denied on November 16, 2006, and again on

March 15, 2007.  (R. 62-66, 68-71.)  On May 23, 2007, McDonald filed his request for a

hearing.  (R. 72.)  On December 15, 2008, he, along with a vocational expert, testified

before Administrative Law Judge ("ALJ") John Dodson.  (R. 20-41.)  Although informed

of the right to representation, McDonald chose to appear and testify without the

assistance of an attorney or other representative.  (R. 22-24, 73-77, 94.)  On January 7,

2009, the ALJ issued a decision denying McDonald's disability claim.  (R. 9-19.)

McDonald requested review by the Appeals Council. (R. 4.)  On September 9, 2009, the

Appeals Council denied McDonald's request for review, at which time the ALJ's decision

became the final decision of the Commissioner.  (R. 5-8); *Zurawski v. Halter*, 245 F.3d

881, 883 (7th Cir. 2001).  McDonald subsequently filed this action in the District Court.

### B.    Medical Evidence

McDonald injured his back for the first time sometime in mid- to late-2003, and

re-injured his back on at least one subsequent occasion in August 2004.  (R. 255, 274.)

McDonald also asserts several additional "incidents" of injury, on December 8, 2003,

March 3, 2004, and April 18, 2005.  (Pl.'s Mem. at 4; R. 348.)  Notably, the ALJ's

opinion states that McDonald was first injured in 2004 and reinjured in 2005.  (R. 15.)

That apparent misreading of the record is discussed in further detail herein.

McDonald began seeing a chiropractor, Matthew D. Marti, D.C., on October 10,

2003.  (R. 256.)  McDonald reported to Dr. Marti that his middle back was sore and that

---

[1]  The record is unclear as to whether (and when) McDonald filed more than one application, and the parties do not directly address that lack of clarity.  (*Cf.* Pl.'s Mem. at 1 [21] *with* R. 12, 47, 52, 57, 58 & Df.'s Resp. at 1 [25].)  However, the resolution of that issue does not appear to have any bearing on the issues currently before this Court.

on an unspecified date, McDonald had felt a pop in his lower back while lifting. (*Id.*) Dr. Marti provided multiple authorizations for McDonald to be excused from all work duties, covering the time period between February 13, 2004 through May 6, 2005. (R. 239-240.)

On October 29, 2003, physical therapist Jeff Schade reported in an initial evaluation that McDonald had been hurt approximately two months earlier. (R. 255.) The evaluation notes that claimant stated he was injured at work while carrying heavy fabricating equipment. (*Id.*) While carrying that equipment, McDonald stepped into a hole and felt a "pop in his back and hip region." (*Id.*) Claimant reported to the physical therapist that, since the incident, he has had "a constant pinching" in his lower back that can be very severe and can make him "almost unable to walk." (*Id.*)

On August 25, 2004, McDonald went to the emergency room at Morris Hospital, where he reported that he was "lifting something from waist high … [and] felt a sharp pain to his back lower … [then] he felt something pop. [He] [d]enie[d] pain or radiation to legs [sic]." (R. 274.) That day, McDonald also had diagnostic imaging done; no evidence was found of fracture, subluxation, or other bony abnormalities. (R. 283.) The emergency room physician Michael Kryza recommended that "the patient will perform light duty lifting less than 5 pounds" and "will follow-up with occupational health within two days." (R. 275.)

McDonald asserts he stopped working almost immediately after his disability onset, in mid-April 2005. (R. 348.) Prior to that point, McDonald's past work included being a saw operator, a parts deliverer, a maintenance manager at a fast food restaurant, and a cashier at a gas station. (R. 135-43, 185-93.) On April 23, 2005,

3

McDonald had a magnetic resonance imaging ("MRI") done of his lumbar spine at St. Mary's Hospital, which revealed normal alignment and no evidence of significant degenerative disc disease. (R. 310.) However, according to the report, the MRI at the "L4-5 level suggests some possible very mild diffuse disc bulging. L5-S1 level demonstrates a small left paracentral disc herniation that extends slightly inferior to the disc space level. It is in close approximation to the exiting left nerve root at the L5-S1 level. The rest of the examination was relatively unremarkable." (R. 310.)

In a form dated August 19, 2005, Dr. Marti indicated that McDonald had a "Class 5" physical impairment, described as "Severe limitation of functional capacity; incapable of minimal (sedentary) activity (75-100%)," that he was "disabled and unable to perform other gainful work," and that he was to have "no work duty, until further notice." (R. 243.) Dr. Marti also indicated that McDonald has "improved," was "ambulatory," and that Dr. Marti expected a "fundamental or marked change in the future" – specifically, "improvement" – relating to McDonald's "job" and "other gainful work." (*Id.*) In late August 2005, Dr. Marti noted that McDonald was scheduled for a neurological consultation. (R. 241.)

McDonald had the neurological consultation on September 8, 2005 with George DePhillips, M.D., S.C. (R. 341.) Dr. DePhillips reported that:

> [P]atient presents … with a several week history of low back pain with pain radiating into both lower extremities and radiates down the posterior thighs and calves to the ankles although the majority of his pain is in the lower back. The patient states that through chiropractic treatments his pain has improved from a 10 to a 4 on a scale of 1-10 although he does continue to have bad days. The patient's MRI scan reveals disc degeneration at the L5-S1 level with a left sided disc protrusion.… The patient's only surgical option is a spinal fusion but he is very young and it is my recommendation that he continue conservative treatment. I have recommended a lumbar

4

epidural steroid injection along with continued chiropractic treatments.

(R. 341.)

As part of the disability application process, medical consultant Madala

Ramakrishna completed a physical residual functional capacity assessment ("RFC") of

McDonald on January 9, 2006. (R. 286-93.) Ramakrishna's primary diagnosis was disc

herniation. (R. 286.) Ramakrishna concluded that claimant could lift and/or carry 10

pounds frequently and 20 pounds occasionally, could stand and/or walk (with normal

breaks) for a total of about six hours in an eight-hour workday, could sit (with normal

breaks) about six hours in an eight-hour workday, and had unlimited push and/or pull

limitations, other than as shown for lifting and carrying. (R. 287.) As support,

Ramakrishna cited claimant's "Hx of back pain." (*Id.*) Ramakrishna also found claimant

was "occasionally" limited posturally, in climbing, balancing, stooping, kneeling,

crouching, and crawling. (R. 288.) As part of the assessment, Ramakrishna also

considered two previous MRI reports and noted there was very mild disc bulge at L4-5.

(R. 293.) Ramakrishna also considered a report from September 8, 2005 (presumably

Dr. DePhillips') where claimant indicated that his pain improved from a ten to a four and

a scale of 1-10. (*Id.*)

On November 4, 2006, ChukwuEmeka Ezike, M.D., M.P.H., of Gozi Health

Services, conducted a consultative exam of McDonald at the request of the Bureau of

Disability Determination Services. (R. 314-17.) Over the course of 30 minutes, Dr.

Ezike reviewed "forms" and interviewed and examined McDonald. (R. 314.) Dr. Ezike

wrote, among other things, that McDonald was able to get on and off the exam table

"with no difficulty" and "could walk greater than 50 feet without support." (R. 316.) Dr.

5

Ezike found claimant's gate to be "non-antalgic without the use of assistive devices," and that he had a normal range of motion in his hips, knees, and ankles, as well as in his cervical spine. (*Id.*) Dr. Ezike found that claimant's lumbar flexion was 45 degrees and extension was ten degrees with mild pain. (*Id.*) He also noted "mild lumbar and paralumbar tenderness," and that claimant's "[s]traight leg raise was positive on the left side at about 60 degrees." (*Id.*) Dr. Ezike listed his "Impression[s]" as "Chronic low back pain," "Lumbar radiculopathy," and "Obesity." (*Id.*)

On November 15, 2006, medical consultant Michael Nenaber, M.D., completed another physical RFC assessment of McDonald. (R. 319-26.) Dr. Nenaber's "primary diagnosis" for McDonald was "Arthritis"; he did not list a "secondary diagnosis." (R. 319.) As part of his assessment, Dr. Nenaber considered Dr. Ezike's consultative exam report. (R. 326.) Dr. Nenaber concluded that McDonald's exertional limitations allowed him to lift 50 pounds occasionally and 25 pounds frequently, to stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday, and to sit (with normal breaks) about six hours in an eight-hour workday. (R. 320.) Dr. Nenabar found McDonald had no push and/or pull limitations, other than as noted for lifting and carrying. (*Id.*) Dr. Nenaber also found claimant is "frequently" limited posturally in climbing ramp/stairs, balancing, stooping, kneeling, crouching, and crawling and is "occasionally" limited posturally in climbing ladder/rope/scaffolds. (R. 321.) Based on those exertional and postural limitations, Dr. Nenaber recommended a "medium work restriction." (R. 326.)

McDonald again saw Dr. DePhillips on December 20, 2006. (R. 340.) In his notes of that visit, Dr. DePhillips wrote that while he had originally recommended a

lumbar epidural steroid injection, McDonald's "work comp" had not approved such a treatment. (*Id.*) Dr. DePhillips also noted that Dr. Marti was going to proceed with lumbar disc decompression treatments, which Dr. DePhillips felt "are reasonable and related to the work injury." (*Id.*) Dr. DePhillips prescribed Norco, wrote that he "will see the patient in follow up in 4-6 weeks," and noted "[t]he patient continues to remain off work." (*Id.*)

At McDonald's next visit with Dr. DePhillips on March 16, 2007, the doctor wrote that claimant "continues to suffer lower back pain with pain radiating into both lower extremities with associated weakness." (R. 340.) Dr. DePhillips also noted that McDonald's MRI scan revealed a midline disc protrusion at the L5-S1 level, which "certainly can be the source of his pain." (*Id.*) Dr. DePhillips wrote that claimant had not undergone epidural steroid injections "as work comp has prevented any further treatment." (*Id.*) He also wrote: "patient at this point is disabled and cannot return to work in any capacity. I suspect he will need to undergo discography and a spinal fusion at the L5-S1 level …. I will see him in 2-3 weeks for follow up examination." (*Id.*)

McDonald had a follow up evaluation with Dr. DePhillips on June 15, 2007. (R. 371.) Dr. DePhillips wrote that "In my opinion [McDonald] remains currently unemployable and totally disabled." (*Id.*) Dr. DePhillips noted that McDonald was awaiting approval to proceed with further diagnostic and therapeutic treatment, and that the doctor had refilled McDonald's medications as needed. (*Id.*)

Another MRI was done on March 25, 2008. (R. 435-36.) The radiological report to Dr. DePhillips, reported by Byron Johnson, M.D., stated: "There is a left paracentral disc protrusion at L5-S1 resulting in slight mass affect on the S1 nerve root in the lateral

recess.  The remaining levels are normal without significant disc bulging, disc

protrusions, spiral or neuroforaminal stenosis." (R. 435.)

On May 13, 2008, claimant saw Udit Patel, D.O., at the Pain & Spine Institute.

(R. 431-33.)  Dr. Patel recommended a "lumbar discogram Post-discogram CT scan."

(R. 433.)  McDonald had the CT of the lumbar spine post-discography done on May 22,

2008.  (R. 434.)  The related report included as "Impressions" "Grade IV radial tears at

the L4-L5 and L5-S1 levels" and "Suspect Grade I tear at the L2-L3 level." (*Id.*)

On August 21, 2008, at Dr. DePhillips' referral, McDonald had a nerve evaluation

done by Elton W. Dixon, M.D.  (R. 441-43.)  Dr. Dixon conducted, among other things,

sensory and motor nerve conduction studies on McDonald.  (R. 443.)  Dr. Dixon's report

stated in conclusion: "This is an abnormal EMG [electromyogram] and nerve conduction

study of the lower extremities.  The findings are consistent with bilateral L4 to S1

radiculopathy." (*Id.*)

After Dr. DePhillips found that McDonald had "failed to improve with conservative

treatment, including chiropractic treatments, lumbar disk decompression, [and] the

passage of time and medications," McDonald had lumbar fusion surgery on September

2, 2008.  (R. 393.)  His pre- and postoperative diagnoses were "mechanical low back

pain with segmental instability, L4-L5, L5-S1." (*Id.*)  Dr. DePhillips performed multiple

procedures, including "posterolateral intertransverse arthrodesis, L4-L5, L5-S1";

"pedicle screw segmental fixation, L4 to S1"; "posterior lumbar interbody arthrodesis,

L4-L5, L5-S1"; "placement of interbody peek prosthetic devices"; "decompressive

lumbar laminectomy, L4-L5, L5-S1"; and "bilateral diskectomies, L4-L5, L5-S1." (R.

393.)  Following the surgery, diagnostic imaging reflected that "There has been

operative lumbar fusion, L-4 -S1, with laminectomies and posterior rods stabilized by intrapedicular bone screws.  The hardware is in good position, and the spine is normal in alignment."  (R. 380.)

On September 25, 2008, another MRI was done.  (R. 388.)  The radiological report noted that McDonald had undergone interval L4 through S1 posterior spinal fusion and laminectomy, that posterior bony fusions had also been performed, and that the hardware was intact and in good position.  (*Id.*)  The report stated "No subluxation. Mild dextroscoliosis is present."  (*Id.*)

Notes from an October 15, 2008 CT lumbar scan stated that no subluxation, "no obvious compression of the thecal sac at L4/5 and L5/S1," and "no obvious spinal stenosis" were found.  (R. 387.)  However, the notes also state that the "evaluation is suboptimal due to artifact arising from the hardware.  It is also difficult to evaluate the neuroforamen due to the artifact."  (*Id.*)

McDonald had a follow up evaluation with Dr. DePhillips on October 17, 2008, approximately six weeks post-surgery.  (R. 358.)  Dr. DePhillips' notes state that McDonald complained of lower back pain with radiation into the hips, buttocks and groin area, and note that was "typical of myofacial and surgical pain."  (*Id.*)  Dr. DePhillips also noted that claimant stated that "[t]he tingling and numbness in the lower extremities that he had prior to surgery has improved."  (*Id.*)  Dr. DePhillips recommended that McDonald "is to remain off work," continue pain medications as needed, and to follow up in three to four weeks.  (*Id.*)  However, it does not appear that McDonald saw Dr. DePhillips again until the end of January 2009.

On January 30, 2009 (notably, after the hearing and the ALJ's issuance of his

9

opinion denying McDonald benefits), McDonald had another follow-up evaluation with

Dr. DePhillips. (R. 439.) Dr. DePhillips noted that McDonald had completed, between

December 15, 2008 and January 29, 2009, eight sessions of water and two sessions of

land physical therapy, with "minimal pain relief" from either. (*Id.*) He noted that pre-

operatively, McDonald had "complained of bilateral leg pain left greater than right which

he graded a 7-9, and that since surgery, the right leg pain has improved but his left leg

has remained a 5 on a 1-10 scale." (*Id.*) Dr. DePhillips also wrote that McDonald

graded his pain a six to seven on a one to ten scale, compared to a seven to nine

before surgery. (*Id.*) Since surgery, McDonald reported that his right leg pain had

improved and his left leg pain had remained a five on a one to ten scale. (*Id.*) Dr.

DePhillips also noted that December 23, 2008 x-rays showed good position of pedicle

screws and rods as well as interbody spacers. (*Id.*) Dr. DePhillips recommended that

McDonald should continue analgesic medications and physical therapy, and "may return

to sedentary work with the following restrictions:"

> He can occasionally lift 5-10lbs, no frequent lifting, no climbing or
> squatting, only occasional bending, twisting and stooping. His sitting and
> standing durations are 15 minutes and 10-15 minutes respectively. He
> can sit and stand or basically work for 2-4 hours per day. Based on these
> restrictions and his educational level the highest being a high school
> diploma, it is my opinion that Mr. McDonald with these restrictions is
> unemployable and totally disabled.

(*Id.*)

### C.    Claimant's Hearing Testimony

McDonald testified before the ALJ on December 15, 2008. (R. 22-35.) As noted

above, claimant waived his right to an attorney. (R. 22-24.) He was 33 years old at the

time of the hearing. (R. 28.) Claimant testified that he dropped out of high school but

10

has since received his GED. (R. 29.) He also testified that he was in special education classes in high school. (*Id.*)

The ALJ asked McDonald about his surgery. (R. 24.) Claimant testified that on September 2 of that year, he had double lumbar fusion surgery. (R. 25.) McDonald further testified that he did not have any mental impairments or depression. (*Id.*) He testified that since his surgery, he had taken or was currently taking OxyContin, Norco, Flexeril, Neurontin, Ambien, Mobic, and Valium. (R. 26-27.) Claimant testified the only side effect he noticed was nightmares. (R. 27.)

McDonald also testified about his daily activities. (R. 29-34.) He testified that he lives in his parents' home. (R. 29.) He stated that he gets up around six or seven in the morning, walks around the house, and has a cup of coffee that his parents make. (R. 30.) He testified that since his surgery, the only housework he does is to put his clothes in the laundry hamper; he does not do the laundry. (*Id.*) He stated that occasionally, he walks down the driveway to check the mail. (R. 32.) He testified that he drives nearly every day. (R. 30.) His hobbies are fishing and hunting, and he went fishing as recently as the summer before the surgery. (R. 30-31.) He also testified that he has a girlfriend and a friend whom he visits, and that he "tinker[s] around" on the computer and reads books and magazines. (R. 31.) He also stated that he needed help bathing after the surgery but is now able to handle his personal hygiene himself. (R. 32.)

Claimant testified that his back keeps him from doing "[a]fter surgery, pretty much everything … there's not too much that I do now that I've had surgery." (R. 29.) He stated that he was "still in quite a bit of pain from the surgery," and that "on the pain pills and all the medications I'm on, I'm in probably about as much pain as I was before

11

surgery … maybe not quite as intense." (*Id.*) He later stated that before his surgery, he had "constant pain" in his legs as well as numbness and tingling, and that since, he still has "occasional numbness and tingling, and the occasional pain, but it's not anywhere near as bad as it was." (R. 33.) He noted however that "the tailbone and [his] back itself actually still hurts about the same as it did," and that ever since he hurt his back, he had "like a bruised tailbone feeling ... that's never went away, even after the surgery." (*Id.*)

McDonald testified that he can "maybe" sit or stand for approximately 30 minutes "at most" at a time, if he is "in something comfortable" and able to move and "situate." (R. 33-34.) He also testified that he could walk from one end of a Wal-Mart store to the other if he leans on the cart. (R. 34.)

McDonald had a cane with him at the hearing. (R. 34-35.) When the ALJ asked him about it, McDonald testified that after his surgery, he was using a walker, which became cumbersome, so he asked if he could use a cane instead, and "they gave me a prescription for it." (R. 35.) He testified that with the help of his cane, he can "probably lift a couple of pounds," but that he is much more limited "as far as out in front of me." (R. 32.) He testified that he could not stand at a sink and wash both hands at the same time without leaning on the sink. (*Id.*)

### D. Vocational Expert's Testimony

Vocational Expert Ronald Malik (the "VE") also testified at the December 15, 2008 hearing. (R. 35-38.) The ALJ asked the VE whether a person with the same age, education, and work experience as McDonald, who is capable of performing a full range of light work, but required a sit/stand option every one-half hour, would be able to

perform McDonald's prior relevant work.  (R. 36-37.)  The VE concluded that would not

be possible.  (R. 37.)  The ALJ then asked the VE whether there were other jobs in the

local, regional, or national economy that such a person could perform.  (*Id.*)  The VE

responded that under the Dictionary of Occupational Titles ("DOT"), such an individual

would be capable of performing representative work such as a small products

assembler II, with 8,200 positions; a marker II, with 5,400 positions; a marker I, with

35,000 positions; and an order caller, with 18,000 positions.  (*Id.*)

The ALJ then asked the VE, in assessing the occupational base, to change the

previous hypothetical to assume the same age, education, and work experience, but

with a full range of sedentary work with a sit/stand option every one-half hour.  (R. 37.)

The VE stated that would eliminate some of the previous light positions but would allow

for the following representative positions: sedentary cashier, with 9,000 positions; an

identification clerk, with 1,600 positions; an appointment clerk, with 22,500 positions;

and a document preparation clerk, with 3,000 positions.  (*Id.*)  When asked to add to

that hypothetical the assumption that such a person would be less than eighty percent

productive, the VE testified that such a limitation would eliminate all jobs in the

occupational base.  (*Id.*)

## II.    LEGAL ANALYSIS

### A.    Standard of Review

This Court must affirm the ALJ's decision if it is supported by substantial

evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d

936, 940 (7th Cir. 2002).  Substantial evidence is "more than a mere scintilla of proof."

*Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001).  It means "evidence a

reasonable person would accept as adequate to support the decision." *Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007); *see also Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation and quotations omitted). In determining whether there is substantial evidence, the Court reviews the entire record. *Kepple*, 268 F.3d at 516. However, our review is deferential. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). We will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

Nonetheless, if, after a "critical review of the evidence," the ALJ's decision "lacks evidentiary support or an adequate discussion of the issues," this Court will not affirm it. *Lopez*, 336 F.3d at 539 (citations omitted). While the ALJ need not discuss every piece of evidence in the record, he "must build an accurate and logical bridge from the evidence to her conclusion." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Further, the ALJ "may not select and discuss only that evidence that favors his ultimate conclusion," *Diaz*, 55 F.3d at 308, but "must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Ultimately, the ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of [his] reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

14

### B.     Analysis under the Social Security Act

To qualify for disability insurance benefits, a claimant must be "disabled" under the Social Security Act (the "Act").  A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176.  The claimant has the burden of establishing a disability at steps one through four.  *Zurawski*, 245 F.3d at 885-86.  If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy."  *Id.* at 886.

The ALJ followed this five-step analysis.  At step one, the ALJ found that McDonald was not engaged in substantial gainful activity and had not been engaged in substantial gainful activity during the period from his alleged onset date of April 15, 2005, through his date last insured of June 30, 2010.  (R. 14.)  At step two, the ALJ found that claimant "had the following severe impairment: disorders of the back discogenic and degenerative."  (*Id.*)  At step three, the ALJ found that McDonald does not have an impairment or combination of impairments that meets or medically equals

one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) At

step four, the ALJ found that claimant has the RFC to perform sedentary work as

defined in 20 C.F.R. 404.1567(a) "except that he must have a sit stand option." (R. 15.)

The ALJ also found that McDonald is unable to perform past relevant work. (R. 17.)

However, at step five, the ALJ found that considering McDonald's age, education, work

experience, and RFC, jobs exist in significant numbers in the national economy that

claimant can perform. (R. 18.) As a result, the ALJ found that McDonald has not been

under a disability from April 15, 2005 though the date of his decision. (R. 19.)

McDonald argues that the ALJ erred in his review of Listing 1.04, erred by not

developing the record after McDonald's surgery, erred in stating that no treating

physician indicated McDonald is disabled, erred in not putting all the restrictions in the

hypothetical posed to the VE, and erred in his credibility determination as to the extent

of McDonald's pain.

### C.  The ALJ's Review of Listing 1.04

As noted above, the ALJ concluded that McDonald did not have an impairment or

combination of impairments that met Listing 1.04. (R. 14.) Listing 1.04 refers to several

disorders of the spine (including herniated nucleus pulposus, spinal arachnoiditis, spinal

stenosis, osteoarthritis, degenerative disc disease, facet arthritis, and vertebral

fractures), resulting in compromise of a nerve root or the spinal cord, with evidence of

nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in

pseudoclaudication. 20 C.F.R. Pt. 404, Sbpt. P, App. 1, § 1.04. After reviewing Dr.

Ezike's November 4, 2006 consultative examination report in detail, the ALJ wrote that

"the evidence does not document the presence of an impairment or combination of

16

impairments that meet the medical criteria of any condition described in the Listing of Impairments…. The claimant has an orthopedic impairment, but he is able to ambulate independently and the medical findings regarding his impairments do not satisfy any musculoskeletal, neurological or any other related listing." (R. 15.)

McDonald asserts that the ALJ erred in his review of Listing 1.04. The sum total of McDonald's argument is that the ALJ only reviewed one record, Dr. Ezike's report, "even though there are records from Ex. 7F (R. 319) to 16 F (R. 443)." Without any further analysis or explanation, McDonald asserts that "This review of a Listing does not meet the minimum requirements for reviewing a Listing" and that a "perfunctory analysis will mean remand especially where the ALJ fails to review significant exhibits."

It bears repeating that claimant has the burden of proving that his condition meets or equals each criterion of a listed impairment. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). Listing 1.04 refers to several disorders, and McDonald has not specified which of those impairments applies here. Nor has he identified any specific piece of evidence in the record supporting his argument that he meets or equals each criterion of Listing 1.04. Instead, he cites generally to exhibits spanning over one-hundred-twenty pages in the record. It is well-established that a "skeletal 'argument'" does not preserve a claim. *U.S. v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991). The Commissioner argues that McDonald has thus waived any allegation of ALJ error in his Listing determination.

We note our dismay with McDonald's counsel's sparse treatment of the Listing issue. However, under the circumstances of this case, we decline to conclude that claimant has waived the issue on appeal. As described in further detail below, the

17

ALJ's errors in connection with his credibility and RFC determinations warrant remand. As a result, the ALJ will have to reconsider the facts of this case, and reconsidering the Listing issue will likely not lead to an undue expenditure of additional time on this matter.  Additionally, as noted above, the ALJ's explanation as to why claimant does not meet a Listing referred to only one exhibit encompassing medical records that pre-dated claimant's surgery by over two years.  Further, as mentioned at the outset, the record reveals that McDonald injured his back for the first time in mid- to late-2003, and re-injured his back on at least one subsequent occasion in August 2004.  (R. 255, 274.) McDonald also asserted several additional "incidents" of injury, on December 8, 2003, March 3, 2004, and April 18, 2005.  (R. 348.)  The ALJ's opinion states that McDonald was first injured in 2004 and reinjured in 2005, but fails to mention the original injury in 2003 and other apparent subsequent injuries.  (R. 15.)

"In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668-69 (7th Cir. 2004) (finding the ALJ's "two-sentence consideration of the Listing of Impairments [was] inadequate and warrants remand").  In particular, the ALJ is required to evaluate any evidence of the required criteria that is favorable to the claimant.  *Ribaudo,* 458 F.3d at 584 ("[the ALJ's] failure here to evaluate any of the evidence that potentially supported [claimant's] claim does not provide much assurance that he adequately considered [the] case"); *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (remanding where ALJ failed to mention the strongest piece of evidence supporting an impairment).  In addition, "[w]hether a claimant's impairment equals a listing is a medical judgment, and

an ALJ must consider an expert's opinion on the issue." *Barnett*, 381 F.3d at 670.

While the ALJ did not need to discuss all medical evidence that showed that McDonald did not meet a medical listing, the ALJ must still "build a logical bridge from evidence to his conclusion." *Taylor v. Barnhart*, 189 Fed. Appx. 557, 561 (7th Cir. 2006). It is questionable whether the ALJ fulfilled this obligation, as he discussed only one record, and failed – without explanation – to discuss more recent, postoperative medical records, along with other evidence arguably favorable to claimant. As a result, on remand, we respectfully direct the ALJ to reanalyze, after consideration of all relevant medical records (including any newly submitted postoperative records), whether claimant has an impairment or combination of impairments that meets or medically equals Listing 1.04.

### D. The ALJ Failed to Appropriately Consider Evidence Regarding Claimant's Credibility.

Because the ALJ is in a superior position to judge the credibility of a claimant, the ALJ's credibility determination is entitled to "special deference." *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004) (citation omitted). However, the ALJ is still required to articulate his reasoning and discuss or distinguish relevant contrary evidence. *Clifford*, 227 F.3d at 870. "Thus, although the ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling. Otherwise it is impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial evidence." *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (citations omitted).

In assessing credibility, the ALJ must also follow the requirements of Social

Security Ruling ("SSR") 96-7p.  *Brindisi*, 315 F.3d at 787.  Among other things, SSR 96-7p requires ALJs to consider the entire case record when evaluating an individual's credibility.  1996 WL 374186, at *4.  Further, when evaluating symptoms of pain, SSR 96-7p also provides:  "Because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of objective medical evidence."  *Id.* at *1.

Here, the ALJ's conclusory discussion of McDonald's credibility contains potentially inconsistent statements, and fails to address key evidence regarding McDonald's symptoms of pain and other limitations.  First, the ALJ states that "After careful consideration of the evidence … claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms.  (R. 16.)  Subsequently, after summarizing claimant's hearing testimony, the ALJ wrote:  "Even considering the claimant's statements concerning the intensity, persistence and limiting effects of [his alleged] symptoms, *while credible and consistent with the above residual functional capacity,* the claimant is not disabled under our rules."  (R. 16 - emphasis added.) However, the ALJ later notes McDonald's description of his activities of daily living "are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations."  (R. 17.)

Unfortunately, the ALJ's opinion contains no other analysis of McDonald's

credibility, leaving us unable to reconcile the ALJ's arguably inconsistent statements

regarding his credibility. Further, the ALJ's failure to address which of McDonald's

statements he found credible, which (if any) he discounted, and why, is inconsistent with

the applicable regulation and Seventh Circuit precedent. *See, e.g.*, SSR 96-7p, 1996

WL 374186, at *4 ("The reasons for the credibility finding must be grounded in the

evidence and articulated in the determination or decision. It is not sufficient to make a

conclusory statement that 'the individual's allegations have been considered' or that 'the

allegations are (or are not) credible.'"); *McKinzey v. Astrue,* 641 F.3d 884, 890 (7th Cir.

2011) ("the ALJ must explain her decision in such a way that allows us to determine

whether she reached her decision in a rational manner, logically based on her specific

findings and the evidence in the record."); *Skarbek v. Barnhart,* 390 F.3d 500, 505 (7th

Cir. 2004) (noting that the "court will affirm a credibility determination as long as the ALJ

gives specific reasons that are supported by the record for his finding.").

Additionally, the ALJ appears to have overstated the implications of the post-

surgical medical record evidence available to him, and ignored claimant's contrary

hearing testimony, in reaching his conclusion (as difficult as it is to decipher) regarding

McDonald's credibility. While the ALJ pointed out that McDonald underwent surgery,

which "certainly suggests that the symptoms were genuine," and that McDonald's taking

of appropriate medications "weighs in [his] favor," the ALJ concluded, based on Dr.

DePhillips' October 17, 2008 report, that the surgery was "generally successful in

relieving the symptoms," and that unspecified "medical records reveal that the

medications have been relatively effective in controlling the claimant's symptoms." (R.

17.) However, the ALJ did not account for the fact that Dr. DePhillips' October 17 report

21

referred only to an improvement in "tingling and numbness in the lower extremities," while McDonald testified as to other unimproved post-surgical symptoms at the hearing. Further, the ALJ failed to address Dr. DePhillips' post-surgical recommendation that McDonald "is to remain off work," his post-surgical notation of "mild dextroscoliosis," or McDonald's testimony that with all the pain medication he takes, his pre- and post-surgical pain were about the same (although "maybe not quite as intense"), and his tailbone and his back still hurt "about the same."[2] The ALJ's failure to articulate his reasoning, and to discuss or distinguish relevant contrary evidence, warrant remand. *See Indoranto*, 374 F.3d at 474 (the ALJ "must confront the evidence that does not support his conclusion and explain why it was rejected."); *Diaz*, 55 F.3d at 307 ("An ALJ may not select and discuss only that evidence that favors his ultimate conclusion").

### E.     The ALJ's RFC Assessment is Deficient.

A claimant's RFC must be based upon the medical evidence in the record and other evidence, such as testimony by the claimant or his friends and family. 20 C.F.R. § 404.1545(a)(3). In making that determination, the ALJ must decide which treating and examining doctors' opinions should receive weight, and explain the reasons for that finding. 20 C.F.R. § 404.1527(d), (f). Additionally, the ALJ's RFC assessment must

---

[2] To the extent McDonald's testimony regarding his post-surgical symptoms and limitations appear to be inconsistent or unclear, the ALJ arguably should have sought further clarification from McDonald at the hearing. *See, e.g., Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991) (when a claimant is unassisted by counsel, the ALJ has a duty to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.") (citations omitted). In light of the fact that we are remanding for further proceedings, we need not decide whether the ALJ erred by not developing the record post-surgery, as McDonald contends. However, on remand, we direct the ALJ to consider Dr. DePhillips' January 30, 2009 report, and to seek appropriate additional evidence regarding McDonald's post-surgical symptoms and limitations, such as his use of a cane and recommendations from his doctor regarding work.

contain a narrative discussion describing how the evidence supports the ALJ's conclusions, and explaining why any medical source opinion was not adopted if the ALJ's RFC assessment conflicts with such an opinion.  SSR 96-8p, 1996 WL 374184, at **5, 7; *accord Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).  Here, the ALJ's RFC assessment is flawed for the following reasons.

First, as noted above, the ALJ concluded that McDonald had the RFC to perform sedentary work with a sit/stand option.  (R. 15.)  In so doing, the ALJ stated that, "[a]s for the opinion evidence, the record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision."  (R. 17.)  However, there are multiple instances in the record where, prior to surgery, Dr. DePhillips explicitly states that McDonald is "totally disabled, "currently unemployable," and "cannot return to work in any capacity."  (R. 371, 340.)  Dr. Marti also indicated that McDonald was "disabled and unable to perform other gainful work," and that he was to have "no work duty, until further notice."  (R. 243; *see also* R. 247 ("Patient is totally incapacitated at this time.").)  Further, following McDonald's surgery, Dr. DePhillips stated McDonald was "to remain off work."  (R. 358.)  By failing altogether to address that evidence, the ALJ's RFC determination violates SSR 96-8p.  1996 WL 374184, at *7.

Second, the ALJ did not address other evidence contrary to his RFC assessment that claimant could perform sedentary work with a sit/stand option.  "Sedentary work" is defined as that involving "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and

standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a). McDonald testified that he has difficulty walking without support, has a prescription for a cane, cannot lift items more than a couple of pounds in weight while using his cane, and cannot stand at a sink and wash both hands at the same time without leaning on the sink to support himself. However, the ALJ stated claimant "does not use a cane to ambulate" and failed to address this other evidence contrary to his conclusion that claimant is capable of the lifting, carrying, walking and standing inherent in sedentary work. The ALJ's failure to address that evidence or to explain why he rejected it warrants remand. *Indoranto*, 374 F.3d at 474.

On remand, we anticipate that the ALJ will consider all of the evidence described above, including that discussed in our evaluation of his credibility determination, when revisiting the issue of claimant's RFC. *See* SSR 96-8p, 1996 WL 374184, at *2 ("RFC is assessed … based on all of the relevant evidence in the case record, including … any 'medical source statements' … submitted by an individual's treating source or other acceptable medical sources."). We also anticipate that on remand, the ALJ will include all appropriate limitations (including any on lifting) when reconsidering, at step five, whether the claimant is capable of performing any work in the national economy.

Notably, we do not agree with McDonald that the ALJ's hypotheticals to the VE necessarily failed to consider claimant's testimony that his tailbone still hurt and he could only sit for a half hour post-surgery, that he used a cane, or that claimant was in special education classes. First, the ALJ's limitation to sedentary work with a sit/stand option could have been a concession to claimant's testimony regarding his tailbone pain

and sitting limitations.  In the event the ALJ reaches a similar RFC assessment on remand, we expect he will clarify his reasons for doing so.  As for claimant's use of a cane, as noted above, claimant's testimony on the subject was arguably confusing, and while it should be clarified on remand, we cannot conclude that it was error for the ALJ not to include a cane restriction in his hypotheticals to the VE.

Finally, McDonald provides no legal support for his argument that the ALJ should have asked the VE about claimant's work options given his participation in special education classes.  An ALJ is not required to include a claimant's alleged limitations in his hypothetical to a VE if the alleged limitations are not found in the medical reports in the record.  *See Ehrhart v. Secretary of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992) (holding that the hypothetical question posed by the ALJ was proper because it reflected plaintiff's impairments to the extent that the ALJ found them supported by medical evidence in the record).  Claimant cites to no medical evidence indicating any limitation related to his mental capacity.  Moreover, claimant testified before the ALJ that he has no mental impairments.  As a result, we cannot conclude the ALJ erred by not raising the issue of special education classes with the VE.

III.     **CONCLUSION**

For the reasons set forth above, claimant's motion for summary judgment [20] is granted in part and denied in part.  This case is remanded to the Social Security Administration for further proceedings consistent with this opinion.  It is so ordered.

ENTERED:

_____

MICHAEL T. MASON
United States Magistrate Judge

Dated: March 12, 2012